ed by the evidence. There was, at most, but a scintilla, not sufficient to sustain a verdict against the will. A discussion of some 300 pages of testimony would be as uninteresting as useless.

The decree is affirmed, and the appeal dismissed at the costs of the appellants.

## Goldbeck v. Kensington National Bank, Appellant.

| 147 | 267 |
|-----|-----|
| 203 | ² 10, |

*Statute of frauds—Consideration—Contract.*

An oral agreement was entered into between the plaintiffs in a judgment and a bank to which they assigned the judgment as collateral security, that if the defendant's land should be sold under execution, the bank should in order to lessen the expenses of the sale, bid up the price to a stipulated sum or give the plaintiffs credit for that amount on the debt secured by the judgment. The bank bid in the land at a nominal sum, the plaintiffs refraining from bidding. *Held*, that the agreement was not within the statute of frauds, and that it was based upon sufficient consideration.

*Ratification—Banks—President.*

In such a case if the bank purchases the property at the sheriff's sale and afterwards sells it and appropriates the profits, it will not be permitted to question the authority of the president of the bank in making the agreement.

*Payment—Joint debtors.*

A payment made by one of several joint debtors inures to the benefit of all the debtors as a credit upon the debt.

Argued Jan. 8, 1892. Appeals, Nos. 446, 447 and 448, Jan. T., 1891, by defendant, from decree of C. P., No. 2, June T., Nos. 395, 396 and 627, dismissing exceptions to the master's reports on three bills in equity. Before PAXSON, C. J., STERRETT, GREEN, McCOLLUM, MITCHELL and HEYDRICK, JJ.

Bills in equity by John H. Goldbeck, Charles F. Goldbeck and Henry L. Goldbeck, against the Kensington National Bank of Philadelphia and others. The cases were referred to John M. Vanderslice, Esq., as examiner and master, from whose reports the facts appear as stated in the opinion of the court below. Exceptions to the master's reports were dismissed by Pennypacker, J., in the following opinion:

" In the early part of the year 1878, Charles F. Goldbeck

was indebted to the Kensington National Bank in the sum of about $47,000, for which he had given promissory notes indorsed by John H. Goldbeck and Henry L. Goldbeck. In order to secure the indorsers, Charles F. Goldbeck confessed a judgment to them for $50,000, which was entered of record in court of common pleas No. 3, in September Term, 1877, and was a lien upon a brewery owned by him, wherein he conducted business, and where he had a large amount of personal property. Upon the brewery were mortgage liens to the amount of about $60,000, prior to that of the judgment. John H. and Henry L. Goldbeck marked this judgment to the use of the bank as collateral security for its claim upon the promissory notes. The bank issued execution upon the judgment and sold the personal property, realizing from it $10,562.33. The real estate was then levied upon and sold by the sheriff, and was purchased by the bank for $1,000. It was sold by the bank about December, 1884, for $90,000. The bank also received from the Goldbecks thirty-one shares of its own stock on October 2, 1878, valued in a settlement made between them at $1,798.

" The master has allowed an absolute credit of $27,000 to the Goldbecks on account of the indebtedness, by virtue of an agreement alleged to have been made between John H. Goldbeck and Mr. Landell, the then president of the bank, to the effect that in order to lessen the expenses of the sheriff's sale the property should be bought by the bank at a nominal figure; that the Goldbecks should make no bid, and that they should be given a credit of at least that amount.

" This finding of the master raised one of the two principal questions in contention between the parties.

" John H. Goldbeck testifies, on page 34 of the master's report:

' A. The bank was to bid that property up to $27,000 if a stranger would bid on it, and if it would not bring $27,000 it would allow $27,000 on the bank account.

' Q. And then it was to be the bank's entirely? What was to be the result if the bank was to allow you $27,000? A. They would have a cheap property.

' Q. They were to allow you $27,000; that is all? A. Yes.

' Q. This is the real estate you were talking about? A. Yes, sir.

' Q. Then you say, if they were willing to allow a credit of

$27,000, that was all it was to cost the bank?   A. It would clear us, clear the debt, pay the notes."

Henry L. Goldbeck testifies, page 45:

' Q. What arrangement did you make with Mr. Landell? A. I made the arrangement that the bank would buy in the property under the judgment; one was to be bought in after the other; first the personal, then the real estate.

' Q. What credit was the bank to give you?   A. $27,000 on the one brewery; the one next to the corner.

' This witness also testified that, at a subsequent period, the cashier of the bank gave him a statement upon a sheet of foolscap paper, afterwards mislaid, on which was a credit for the $27,000.   There was evidence that a firm of Eble & Herter had agreed before the sheriff's sale to buy from the bank a portion of the real estate for the sum, over and above the mortgage upon it, of $27,000; and from the minutes of the board of directors of the bank of December 13, 1878, it appeared that a resolution was passed authorizing the president ' to buy the brewery property,' and ' to bid for the same enough to cover the several mortgages, amounting to $60,000, and the balance of the indebtedness due to the bank by the said Charles F. Goldbeck,' etc.   John H. Goldbeck testified that the real estate was worth at the time about $90,000, and it would seem from this resolution that the valuation put upon it by the bank was not far from the same figure.   There is consequently nothing improbable in the alleged terms of the agreement, and it certainly was to the interest of the Goldbecks to see that the property was not sacrificed for the comparatively small sum of $1,000, and of the bank to get the title with as little expense as possible.   There is sufficient and direct testimony as to the existence of the agreement, and it would seem, therefore, that this finding of fact by the master ought not to be disturbed.

" It is contended on behalf of the bank, that the agreement to allow a credit in any event of $27,000, if made, not being in writing, was within the statute of frauds; that the president of the bank had no authority to make it, and that it was without consideration.   The master has found that this arrangement was collateral to, and in fact a part of, the original agreement for the transfer of the judgment.   When it was made does not appear definitely in the testimony, but John H.

Goldbeck says, page 50, that it was after the judgment had been transferred and before the sale by the sheriff. If the finding of the master that it was a part of the original agreement be correct, and we are inclined, upon an examination of all of the evidence, to conclude that it was a part of a plan for the utilization of the judgment for the benefit of all of the parties, they then being upon terms of entire friendship and good will, the subject-matter of the agreement was not real estate, but a judgment which was in effect sold for a valuable consideration. Neither John H. nor Henry L. Goldbeck had any interest in the real estate. What they had was a judgment, which was, it is true, a lien upon the real estate, and for the use of it by the bank they were to receive a credit upon account of their indebtedness of $27,000. If this interpretation of the transaction be correct, the statute of frauds has no application, and the question of want of consideration, which only arises if it were a later and independent contract, disappears. Whether the resolution of the directors, instructing the president of the bank to bid the property up to an amount sufficient to cover the mortgages and the indebtedness, gave him authority to make the agreement or not, the acceptance of the judgment, its use for the purpose of selling the personal and real property, the purchase of the realty and its subsequent sale, amounted to the ratification of the terms upon which the judgment was obtained and used. It is now too late to raise the question of the authority of the officers of the bank.

"At the time of the purchase by the bank of the brewery, among the mortgages making up the sum of $60,000 was one for $14,000, which had been given in 1877 by Charles F. Goldbeck to Henry L. Goldbeck, and had been assigned by the latter to his father-in-law, Jacob Schoening, as a collateral security for certain indebtedness due by him. Henry L. Goldbeck procured the satisfaction of this mortgage, and Schoening and the bank entered into a written agreement for the purpose, October 6, 1882, which set forth, inter alia, that the bank should release Henry L. Goldbeck ' from all his indebtedness to the said bank, provided that nothing herein contained shall be construed as releasing John H. Goldbeck or Charles F. Goldbeck, who are also parties to said notes.' At the same time John H. and Charles F. Goldbeck gave a written statement to the bank that they

had received notice of and assented to the release of Henry L. Goldbeck, and agreed that it 'shall not in any manner be construed to operate as a discharge of our, or either of our, liability upon said promissory notes, but on the contrary, our responsibility shall remain unaffected because of the existence of said release and agreement.' The master allowed this payment of $14,000 with interest, as a credit to all of the defendants, and, in so finding, we think he was entirely right. An actual payment, such as this was in substance, made by one of the debtors, must enure to the benefit of all of them, or otherwise the same debt might be recovered as many times as there were debtors. The purpose of the agreement of October 6, 1882, was to preserve the liability of the other two debtors ; it was not to determine the amount of that liability. It was to enable the bank to recover against them any balance which may have remained due. To hold that it was meant to require that the remaining debtors should pay a second time what had already been paid by one of them, would be to construe words, of a different and entirely sensible purport, in such a way as to do manifest injustice.

" The master, upon making a calculation of the amount of the indebtedness as it originally existed, with the interest, and of these items of credit, with the interest, has found that the bank has been overpaid, as of the date of filing his report, by the sum of $3,177.08, and has recommended a decree awarding this sum to Schoening as assignee of Henry L. Goldbeck. Upon the argument, however, the claim to this sum was waived by Schoening and the Goldbecks, which relieves the court from the necessity of considering the items of charge and countercharge with respect to the real estate while in the hands of the bank.

" The exceptions to the master's report are dismissed and the report confirmed."

Defendant appealed.

*Error assigned* was the dismissal of the exceptions.

*E. Cooper Shapley,* for appellant.

*William W. Wiltbank, Albert E. Peterson* with him, for appellees.

PER CURIAM, January 25, 1892.

We affirm the decree in each of the above appeals upon the opinion of the learned judge of the court below, and said appeals are dismissed at the costs of the respective appellants.

## Krug v. German Fire Insurance Co., Appellant.

*Fire insurance—Breach of policy—Single violation.*

A single brief violation of the terms of a policy of fire insurance, for the necessary work incidental to the preservation of the property insured, will not be considered a breach of a condition which prescribes the use of the premises.

*Use of premises for storage purposes only.*

A policy of fire insurance on a canning house and on machinery and canned goods contained therein, provided that the premises should not be occupied for any purpose other than storage. Five days after the canning season had ended and the policy had been renewed, a fire was built in the furnace under the engine on the premises, to blow out the water from the boiler and pipes. On the same evening the premises were destroyed by fire: *Held*, that the policy was not rendered void by building the fire.

Argued Jan. 13, 1892. Appeal, No. 166, July T., 1891, by defendant, from judgment of C. P. No. 1 of Philadelphia Co., March T., 1890, No. 93, sustaining exceptions to report of referee. Before PAXSON, C. J., STERRETT, GREEN, WILLIAMS, McCOLLUM, MITCHELL and HEYDRICK, JJ.

Assumpsit by Frank Krug to use of James M. Bowling & Co. against The German Fire Insurance Company of Philadelphia, on a policy of fire insurance. The case was referred by agreement to R. C. Dale, Esq., under the Act of May 15, 1874. The referee reported in favor of the defendant. Exceptions to the report were sustained and judgment entered in favor of the plaintiff. Defendant appealed. The facts appear in the opinion of the Supreme Court.

*Errors assigned* were (1, 2) the sustaining and not overruling the exceptions ; (3, 4) the entry of judgment for plaintiff and not for defendant.

*Henry N. Paul,* for appellant, cited Lebanon Mut. Fire Ins. Co. v. Erb, 112 Pa. 149 ; Houghton v. Ins. Co., 8 Met. (Mass.)